# THE UNITED STATES

## vs.

# THE "TROPIC WIND" AND CARGO.

---

1. While Congress alone has power under the Constitution to declare war, grant letters of marque, &c., the President may lawfully proclaim a blockade of any of the ports of the United States when in his judgment the exigency for such action has arisen.
2. A blockade of the ports of Virginia having been proclaimed by the President April 27th, 1861, and the same having been declared effective on the 30th of the same month, a vessel captured violating such blockade after notice becomes lawful prize of war.
3. Notice of a blockade may be actual or constructive.
4. A blockade is violated by egress as well as ingress of the blockaded port by a neutral vessel with a cargo loaded after notice of the blockade, and if captured, the cargo as well as the vessel becomes lawful prize of war.

In Admiralty. June Term, 1861.

LIBEL in admiralty to condemn as prize a vessel and cargo captured violating a blockade.

MR. CARRINGTON for libellant.

MR. CARLISLE for the vessel and cargo.

MR. JUSTICE DUNLOP delivered the opinion of the Court:

A libel has been filed by the United States, and the captors, in this Court, sitting in admiralty, to condemn as prize, the English Schooner "Tropic Wind" and cargo, valued at $22,000, for violating a blockade of the ports of Virginia, proclaimed by the President of the United States on the 27th April, 1861.

The capture was made in or near the mouth of James River by the United States ship "Monticello," Captain ———, on the 21st May, 1861. The blockade of the port of Richmond, Virginia, into which port the "Tropic Wind"

had entered, before the proclamation is alleged to have been made effective on the 30th April and notice of it brought home to the captain of the "Tropic Wind" and the British consul at Richmond at least as early as the 2d of May. Fifteen days from the 30th April, which was the first day of the effective blockade, were allowed by the United States to neutral vessels to leave the blockaded port of Richmond.

It appears that the "Tropic Wind" commenced to load her cargo at Richmond, Virginia, on the 13th of May, completed her loading on the 14th May, and sailed from Richmond the same day bound for Halifax, Nova Scotia.

Mr. Carlisle appeared for the vessel and cargo, filed the answer of Captain Layton, and the case has been argued and submitted to me on the libel, answer, evidence taken in *preparitorio* and official documents.

The authority of the President to institute the blockade is denied by the respondents, who insist that this power, under the Constitution of the United States, can only be exercised by the National Legislature, and this is the first question to be considered.

It is true no department of the Federal Government can exercise any powers not expressly conferred on it by the Constitution of the United States, or necessary to give effect to granted powers; all others are reserved to the States respectively or to the people. In the second article of the second section of the Constitution of the United States, is this provision: "The President shall be Commander-in-Chief of the army and navy of the United States and of the militia of the several States when called into the actual service of the United States."

In the war with Mexico, declared by Congress to exist by the act of Mexico (see 9th Statutes at Large, p. 9), the Supreme Court have maintained in two cases, that the President, without any act of Congress, as Commander-in-Chief of the army and navy, could exert the belligerent right of levying contributions on the enemy to annoy and weaken

him. In the case of Fleming *et al. vs.* Page, 9th Howard, 615, the present Chief Justice says: "As commander-in-chief he is authorized to direct the movements of the naval and military forces placed by law at his command, and to employ them in the manner he may deem most effectual to harrass and conquer and subdue the enemy." Again, at page 616: "The person who acted in the character of collector in this instance, acted as such under the authority of the military commander and in obedience to his orders and the duties he exacted, and the regulations he adopted were not those prescribed by law, but by the President in his character of commander-in-chief. The custom house was established in an enemy's country, as one of the weapons of war. It was established, not for the purpose of giving the people of Tamaulipas the benefits of commerce with the United States or with other countries, but as a measure of hostility, and as a part of the military operations in Mexico; it was a mode of exacting contributions from the enemy to support our army, and intended also to cripple the resources of Mexico, and make it feel the evils and the burdens of the war. The duties required to be paid were regulated with this view, and were nothing more than contributions levied upon the enemy, which the usages of war justify when an army is operating in the enemy's country."

The other case to which I allude is Cross *et al. vs.* Harrison, 16th Howard, 189, 190. Judge Wayne in delivering the opinion of the Supreme Court says, "Indeed from the letter of the then Secretary of State and from that of the Secretary of the Treasury, we cannot doubt, that the action of the Military Governor of California was recognized as allowable and lawful by Mr. Polk and his Cabinet. We think it was a rightful and correct recognition under all the circumstances, and when we say rightful we mean, that it was constitutional, although Congress had not passed an act to extend collection of tonnage and import duties to the ports of California. California or the port of San Francisco

had been conquered by the arms of the United States as early as 1846. Shortly afterward, the United States had military possession of all of Upper California. Early in 1847 the President as Constitutional Commander-in-Chief of the Army and Navy, authorized the military and naval commanders of our forces in California, to exercise the belligerent rights of a conqueror, and to form a civil government for the conquered country, and to impose duties on imports and tonnage as *military contributions,* for the support of the Government and of the Army, which had the conquest in possession, &c. No one can doubt that these orders of the President and the action of our Army and Navy Commanders in California, in conformity with them, was according to the law of arms,"

Blockade is a belligerent right under the law of nations where war exists and is as clearly defined as the belligerent right to levy contributions in the enemy's country. As the Supreme Court hold the latter power to be constitutionally in the President without an Act of Congress, as Commander-in-Chief of the Army and Navy, it follows necessarily that the power of blockade also resides with him—indeed it would seem a clearer right if possible, because, as Chief of the Navy, nobody can doubt the right of its commander to order a fleet or a ship to capture an enemy's vessel at sea, or to bombard a fortress on shore, and it is only another mode of assault and injury to the same enemy to shut up his harbors and close his trade by the same ship or fleet. The same weapons are used. The commander only varies the mode of attack.

In the 1st article, section 8, clause 11, of the Constitution under the legislative head, power is granted to Congress to declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water.

These powers are, therefore, solely confided to and within the control of the Legislature and cannot be exercised by the President. The President cannot declare war, grant

letters of marque, &c., though all other belligerent rights arising out of a state of war, are vested in him as Commander-in-Chief of the Army and Navy. But war declared by Congress is not the only war within the contemplation of the Constitution. In clause 15, article 1, section 8, among the legislative powers is this, " to provide for calling forth the militia, to execute the laws of the Union, suppress insurrections and repel invasions," and the Legislature in execution of this power passed the act of 1795 (1st Stat. at Large, 424), vesting in the President, under the terms set forth in the statute, discretionary power over the militia, in the cases enumerated in this 15th clause of sec. 8, article 1. The status of foreign nations, whose provinces or dependencies are in revolution, foreign invasion of our own country and insurrection at home, are political questions determinable by the Executive branch of our Government. On this subject, in the case of The Santissima Trinidad, 7th Wheaton, 305, it is said:

" This Court has repeatedly decided, that it will not undertake to determine who are sovereign States, but will leave that question to be settled by the other Departments who are charged with the external affairs of the country and the relations of peace and war. It may, however, be said that both the Judiciary and the Executive have concurred in affirming the sovereignty of the Spanish colonies now in revolt against the mother country. But the obvious answer to this objection is that the Court following the Executive Department have merely declared the notorious fact that a civil war exists between Spain and her American provinces, and this so far from affirming is a denial of the sovereignty of the latter. It would be a public and not a civil war if they were sovereign States. The very object of the contest is to decide whether they shall be sovereign and independent or not. All that the Court has affirmed is, that the existence of this civil war gave to both parties all the rights of war against each other."

In cases of invasion by a foreign power or insurrection at home, in which cases under the act of 1795 the President may call out the militia, the Supreme Court in 12 Wheaton (case of Martin *vs.* Mott), page 29, 30, say it is exclusively with the President to decide whether the exigencies provided for have arisen. These also are political questions determinable by the Executive alone, and the Courts follow that branch of the Government. In this case at page 32 the Supreme Court say: " It is no answer that such a power may be abused, for there is no power which is not susceptible of abuse. The remedy for this, as well as for all other official misconduct, if it should occur, is to be found in the Constitution itself." Whether insurrection has grown to such a head, has become so formidable as to have culminated in civil war, it seems to me must also belong as to its decision to the same political branch of the Government. The President in his proclamations relating to the blockade of the ports of the Confederate States calling out seventy-five thousand militia to suppress insurrection and the resistance to the Federal laws, alleges " that nine States have so resisted and have threatened to issue letters of marque to authorize the bearers thereof to commit assaults against the vessels, property and lives of citizens engaged in commerce on the high seas and in the waters of the United States; that public property of the United States has been seized, the collection of the revenue obstructed, and duly commissioned officers of the United States while engaged in executing the orders of their superiors have been arrested and held in custody as prisoners or have been impeded in the discharge of their official duties without due legal process by persons claiming to act under authorities of the State of Virginia and North Carolina. An efficient blockade of the parts of those States will also be established."

These facts so set forth by the President with the asser-

tion of the right of blockade, amount to a declaration that civil war exists.

Blockade itself is a belligerent right and can only legally have place in a state of war, and the notorious fact that immense armies in our immediate view are in hostile array against each other in the Federal and Confederate States, the latter having organized a government, and elected officers to administer it, attest the executive declaration that civil war exists—a sad war—which if it must go on, can only be governed by the laws of war, and its evils mitigated by the principles of clemency engrafted upon the war code, by the civilization of modern times.

Nor does the assertion of the right in the proclamation of the 19th April, 1861, to proceed against privateersmen under the laws of the United States as pirates, militate against the construction I have above given of the two proclamations, as averring the existence of civil war.

In the case of Rose *vs.* Himely, 4th Cranch, 272-3, Ch. J. Marshall in delivering the opinion of the Court, says: "It is not intended to say that belligerent rights may not be superadded to those of sovereignty. But admitting a sovereign, who is endeavoring to reduce his revolted subjects to obedience, to possess both sovereign and belligerent rights and to be capable of acting in either character, the manner in which he acts must determine the character of the act. If, as a legislator, he publishes a law ordaining punishments for certain offenses, which law is to be applied by courts, the nature of the law and the proceedings under it, will decide whether it is an exercise of belligerent rights, or exclusively of his sovereign powers; and whether the Court in applying this law to particular cases, acts as a prize court or as a court enforcing municipal regulations."

In this case I am sitting in admiralty, adjudging a question of prize under a capture for alleged violation of blockade.

I do not find, on examination of the writers on public

law, any difference as to belligerent rights in civil or foreign war, and Judge Story, in 7th Wheaton, as heretofore cited by me, says they are the same.

Blockade being one of these rights, incident to a state of war, and the President having, in substance, asserted civil war to exist, I am of opinion the blockade was lawfully proclaimed by the Executive.

The next enquiry is, when did the blockade become effective, and as such come to the knowledge of the respondents or their Government. Notice, actual or constructive, will do. In the present case, Flag Officer Pendergrast, commanding Home Squadron, officially announced the blockade of the ports of Virginia, whose outlet was Hampton Roads, as effective on the 30th April, 1861, and the Secretary of the Navy in his letter of the 9th May, 1861, states this notice was sent to the Baltimore and Norfolk papers, and by one or more of them published. In a certificate of the British consul at Richmond, dated 14th May, 1861, found on board the "Tropic Wind," at the time of her capture, he states he had received an authoritative communication on the 11th May, which he immediately communicated to the captains of British merchant vessels, and others interested in British trade, that fifteen days would be allowed to leave port after the actual commencement of the blockade, with or without cargoes, "*and whether the cargoes were shipped* before or after the commencement of the blockade," and that upon inquiry he found the 2d May, 1861, to be the day when the efficient blockade began.

There does not appear in the cause any evidence to show that the United States Government agreed to relax the law of blockade, so as to allow British vessels to load cargoes and come out of port, after knowledge of effective blockade was brought home to them. The letter of Mr. Welles to Mr. Seward, of date 9th of May, 1861, in answer to inquiries of Lord Lyons, relative to British vessels in Virginia

ports, and the operation of the blockade upon them, &c., and which it must be presumed was sent to Lord Lyons, does not contain the relaxation of the law of blockade referred to in the British consul's certificate of the 14th May, 1861, by which I mean that it contains no permission to British vessels to come out of port within the fifteen days, with cargoes laden on board, after notice of commencement of effective blockade. I give an extract from that letter of the 9th of May, 1861: "Fifteen days have been specified as a limit for neutrals to leave the ports after actual blockade has commenced, with or without cargo, and there are yet remaining five or six days for neutrals to leave; with proper diligence on the part of persons interested, I see no reason for exemption to any."

It also appears in the evidence of the master, Layton, that he heard in Richmond of the blockade as effective before he began to load his cargo, and was informed it commenced on the 2d May.

All the testimony concurs in showing the cargo was laden on board the "Tropic Wind" on the 13th and 14th days of May, 1861.

No principle of prize law seems better settled than that such lading violates the blockade and forfeits both vessel and cargo. In Wildman on Search, Capture and Prize, page 42, it is said: "The act of egress is as culpable as the act of ingress; and a blockade is just as much violated by a ship passing outwards as inwards. A blockade is intended to suspend the entire commerce of the place, and a neutral is no more at liberty to assist the traffic of exportation, than of importation. The utmost that can be allowed to a neutral vessel is, that having already taken in a cargo before the blockade begins, she may be at liberty to retire with it. If she afterwards takes on board a cargo, it is a fraudulent act and a violation of the blockade. It is lawful for a ship to withdraw from a blockaded port in ballast, or with a cargo shipped *bona fide* before notice of the blockade," (see

also the Judith, Robinson, 150.   The Juno, 2d Robinson, 119.   The Nossa Sentiora, 5th Robinson, 52.)

In Wildman's International Law, vol. 2d page 205, we find this passage " Where the blockade is known at the port of shipment, the master becomes an agent for the cargo; in such case, the owners must at all events answer to the country imposing the blockade for the acts of persons employed by them; otherwise by sacrificing the ship, there would be a ready escape for the cargo, for the benefit of which the fraud was intended." (See also The Jas. Cook, Edwards, 261; The Arthur, Edwards, 202; The Exchange, Edwards 40; 1st Kent's Commentaries (2d Edition) 144–146; Olivera *vs.* Union Insurance Company, 3d Wheaton, 194—see also the reporter's note to the same case.   It follows, upon the case, as it now stands, there must be condemnation of both vessel and cargo.